**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CLYDE J. MARSHALL, | No. CIV S-06-2880-CMK |
| Plaintiff, | |
| vs. | <u>MEMORANDUM OPINION AND ORDER</u> |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

_____/

  Plaintiff, who is proceeding with retained counsel, brings this action for judicial review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). Pursuant to the consent of the parties, this case is before the undersigned for final decision on plaintiff's motion for summary judgment (Doc. 18) and defendant's cross-motion for summary judgment (Doc. 20).

/ / /

/ / /

/ / /

/ / /

# I. PROCEDURAL BACKGROUND

Plaintiff applied for social security benefits on September 13, 2002.  In his application, plaintiff claims that disability began on August 16, 2000.  Plaintiff claims his disability consists of "back, neck, and throat cancer."   Plaintiff is a United States citizen born October 17, 1952, with a limited education.  Plaintiff's claim was initially denied.  Following denial of his request for reconsideration, plaintiff requested an administrative hearing, which was held on February 18, 2004, before Administrative Law Judge ("ALJ") Antonio Acevedo-Torres. In his March 15, 2004, decision, the ALJ made the following findings:

1.  The claimant met the disability insured status requirements of the Act on August 16, 2000;

2.  The claimant did not perform substantial gainful activity on or after August 16, 2000;

3.  The medical evidence establishes that the claimant has severe status post throat cancer residuals and musculoskeletal impairments, but that he does not have an impairment or a combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4;

4.  The claimant's testimony is partially credible for the reasons set forth in the body of this decision;

5.  From August 16, 2000, to October 14, 2002, the claimant's residual functional capacity was such that he could not perform even sedentary work because he was unable to perform prolonged sitting, standing, walking, bending, lifting, and postural tasks; however, beginning October 15, 2002, there has been medical improvement in the claimant's condition which renders him capable of performing light work . . .  eroded by an inability to engage in repetitive postural tasks;

6.  The claimant is unable to perform his past relevant work;

7.  The claimant is 51 years of age, which is defined as closely approaching advanced age; however, he was a younger age individual prior to October 15, 2002;

8.  The claimant possesses a limited education;

9.  Between August 16, 2000, and October 14, 2002, the claimant's range of sedentary work was significantly compromised and, under Section 201.00(h) of Appendix 2, a finding of disabled during this period is appropriate;

10.     Medical improvement related to the claimant's ability to work occurred effective October 15, 2002;

11.     During the period from October 15, 2002, and continuing through at least the date of this decision, the claimant could perform light work with postural restrictions and, under Rule 202.11 of Table No. 2, Appendix 2, Subpart P, Regulations No. 4, a findings of not disabled . . . is warranted during this period;

12.     The claimant is entitled to a closed period of disability from August 16, 2000, through October 14, 2002, as defined in the Social Security Act.

The Appeals Council granted review and remanded the case.  The ALJ's conclusion that plaintiff was disabled from August 16, 2000, through October 14, 2002, was affirmed.  However, in its April 13, 2005, opinion, the Appeals Council stated:

The hearing tape has been certified as lost; therefore, the record is incomplete.  In addition, state agency reviewing physicians indicated that the claimant has some moderate to marked mental limitations (Exhibit 7F).  The decision does not state what weight was given to this opinion, or provide specific reasons for giving it no weight (Social Security Ruling 96-6p).  The claimant achieved IQ scores under 71 (Exhibit 5F).  While the psychologist felt that these scores were an under-representation of the claimant's intellectual abilities, the decision does not contain any findings in this regard.

Accordingly, the Administrative Law Judge will obtain all available updated medical records from the claimant's treating sources, particularly supporting clinical evidence or clarification from his treating physicians, and give him an opportunity for a supplemental hearing.  The Administrative Law Judge will give further consideration to the claimant's maximum residual functional capacity, including non-exertional limitations, for the relevant period since October 14, 2002.  In this regard, the Administrative Law Judge will also determine if evidence is needed from a medical expert to help resolve any inconsistencies in the record with respect to the claimant's mental impairments.

The Administrative Law Judge will also make findings of fact with respect to the exertional and non-exertional requirements of any work found to be past relevant work.  If the claimant is found to be unable to perform past relevant work, the Administrative Law Judge will obtain evidence from a vocational expert on the extent of his non-exertional limitations further diminish the occupational base.  If appropriate, the Administrative Law Judge will ask the vocational expert to identify examples of jobs the claimant can perform and to state the incidence of such jobs in the national economy.  The Administrative Law Jude will identify and resolve any conflicts between the jobs identified by the vocational expert and their descriptions in the Dictionary of Occupational Titles (DOT) and its companion publication. . . .

3

Notably, the Appeals Council did not disagree with the ALJ's conclusion that plaintiff's medical condition had improved after October 14, 2002. Rather, the primary basis for remand was evidence of plaintiff's mental impairment.

Supplemental hearings were held on September 7, 2005, and November 2, 2005. In his November 22, 2005, decision, the ALJ made essentially the same findings. In particular, the ALJ found, as he did before, that plaintiff did not have any severe mental impairment. He did, however, make the following new findings with respect to the period after October 14, 2002:

    1.    Beginning October 15, 2002, and continuing through at least the date of this decision, the vocational expert credibly testified that an individual with the claimant's vocational factors and residual functional capacity, is considered to be fully capable of performing the following occupations that exist in significant numbers: small parts assembler, a light job . . .; insert machine operator, a light job . . .; can filling machine operator, a light job . . .; electronics loader, a sedentary job . . .; table worker, a sedentary job . . .; and almond blancher, a sedentary job . . . .; and

    2.    The severity of the claimant's alcohol abuse satisfies the criteria set forth in Cooper v. Bowen, 815 F.2d 557 (9th Cir. 1987), and has precluded him from working for at least 12 continuous months . . .; however, under Public Law (Pub. L.) 104.121, the contract with America Advancement Act of 1986, provides that Social Security Administration is prohibited from awarding Title II or Title XVI benefits payments to individuals when drugs and/or alcohol are material and contributing factors to a determination of disability.

Based on these findings, the ALJ concluded that plaintiff was not disabled after the closed period from August 16, 2000, through October 14, 2002, and not entitled to benefits. After the Appeals Council declined further review on October 30, 2006, this appeal followed.

## II. SUMMARY OF THE EVIDENCE

Because it is not disputed that plaintiff was disabled due to severe impairments from August 16, 2000, through October 14, 2002, the court does not focus on medical records from that time period. The issue is whether the ALJ erred in concluding that plaintiff was not disabled after October 14, 2002. Therefore, the court will discuss those records which document plaintiff's physical and mental condition after that date.

A. **Medical Records – Physical Impairments**

The certified administrative record ("CAR") contains the following relevant medical records concerning plaintiff's physical impairments:  (1) physical residual functional capacity assessment dated October 15, 2002, by agency consultative doctor David Pong, M.D. (CAR 374-81); (2) medical records from Kaiser Permanente covering the period from January 2003 through June 2005 (CAR 382-409; 426-48; 488-510); (3) internal medicine evaluation dated March 8, 2003, by agency examining doctor Alexandre Mihelson, M.D. (CAR 330-36); (4) physical residual functional capacity assessment dated April 1, 2003, by agency consultative doctor Antoine Dipsia, M.D. (CAR 344-51); (5) medical records from Radiation Oncology Center covering the period from October 2003 through May 2005 (CAR 419-24; 486-87); and (6) physical residual functional capacity assessment dated September 21, 2004, by agency consultative doctor Sandra Clancey, M.D. (CAR 449-56).

1. Agency Doctor Assessments

The following agency doctors provided assessments regarding plaintiff's physical impairments:  (1) David Pong M.D.; (2) Alexandre Mihelson, M.D.; (3) Antoine Dipsia, M.D.; and (4) Sandra Clancey, M.D.

Dr. Pong, an agency consultative doctor who did not examine plaintiff, completed a physical residual functional capacity assessment on October 15, 2002.  He concluded that plaintiff could occasionally lift up to 20 pounds and frequently lift up to ten pounds.  He determined that plaintiff could sit, stand, and/or walk for about six hours in an eight-hour day, and that his ability to push and/or pull was unlimited.  Dr. Pong also found that plaintiff could occasionally climb, balance, stoop, kneel, crouch, and/or crawl.  He did not note any manipulative, visual, communicative, or environmental limitations.  Finally, he noted that plaintiff was "mostly credible but throat cancer seems controlled."

/ / /

/ / /

1          Dr. Mihelson completed an internal medicine evaluation on March 8, 2003,

2   following his examination of plaintiff.  He noted that plaintiff presented complaints of

3   generalized pain "pretty much all the time."  Dr. Mihelson's impression was:  "Degenerative

4   changes of the spine with a decreased range of motion.  Status post radiation therapy for spinal

5   cell cancer with residuals."  His functional capacity assessment substantially agrees with Dr.

6   Pong's.  Specifically, Dr. Mihelson concluded:

7               In consideration of the above problems, the patient is restricted to pushing,
            pulling, lifting, and carrying to about 20 pounds occasionally, and about 10
8               pounds frequently,  Sitting is unrestricted.  In terms of standing and
            walking, the patient is restricted to about 6 hours in an 8-hour workday.
9               There are postural restrictions including bending, kneeling, stooping,
            crouching, and crawling.  There are no environmental restrictions such as
10              walking on uneven surfaces, climbing ladders or stairs.  There are no
            restrictions of hearing or seeing as well as the use of the hands for fine and
11              gross manipulation.

12          Drs. Dipsia and Clancey, also consultative doctors, provided physical residual

13   functional capacity assessments on April 1, 2003, and September 22, 2004, respectively.  Their

14   assessments agree with those of Drs. Pong and Mihelson.

15                  2.      Kaiser Permanente Records

16          Records from Kaiser Permanente cover plaintiff's treatment from January 2003

17   through June 2005.   On January 24, 2003, Edward Posuniak, D.O., opined that plaintiff is unable

18   to perform work duties due to back pain and lumbar spasm.  Dr. Posuniak also stated that

19   plaintiff had mild degenerative disc disease and "squamous cell carcinoma of the larynx."  He

20   opined that plaintiff's disability is permanent.

21          On April 30, 2003, Christopher Jones, M.D., reported the following results of a

22   physical examination:

23              [Plaintiff] looks well.  His voice is strong.  His weight is stable.  There is
            no cervical or supraclavicular adenopathy.  The skin is well healed, and
24              there are no lesions seen in the oral cavity.  Palpation of base of tongue is
            negative.

25

26   ///

On September 25, 2003, Dr. Posuniak reported on his examination of plaintiff. Plaintiff complained of back pain.  However, plaintiff also stated that his pain was responding well to treatment, which included medication and exercise, although he reported that exercise was painful.  Regarding a prior bone scan, Dr. Posuniak noted:  "He also had a bone scan that failed to show any significant spinal cord pathology in the cervical, thoracic, or lumbar spine."  Dr. Posuniak reported that plaintiff was "tender in the upper cervical paraspinal area" and that "[i]n the supine position cervical spine lateral flexion right and left . . . all had full range of motion . . . but there was end range of motion pain with some guarding."  Plaintiff also reported pain in response to other range of motion testing.  Dr. Posuniak's treatment plan included medication, referral for acupuncture treatment, and a follow-up MRI.

Treatment notes from November 3, 2003, reflect that plaintiff's pain remained about the same and that the treatment plan was unchanged.  On November 10, 2003, plaintiff's pain was "better, improved" and the treatment plan was unchanged.  On December 17, 2003, and March 2, 2004, plaintiff reported that his pain is "much better, improved considerably."  Again, the treatment plain was unchanged.

On February 2, 2005, Dr. Posuniak stated:

> Regarding this patient, Clyde Marshall . . . , I have not seen him since 2/10/04.  He has myofascial pain which is not a disabling condition in my opinion. . . .

He also reported that plaintiff did not continue follow-up treatment with him.

On March 3, 2005, Dr. Glenn Yee, M.D. reported on a digital lumbosacral scan as follows:

> Normal height and alignment of vertebral bodies is seen with relative preservation of intervertebral disk space noted.  Mild degenerative changes are seen with small anterior and lateral osteyphytes at L4-5 and L5-S1 and to a lesser degree at L3-4.  The study is otherwise unremarkable.

/ / /

/ / /

On May 5, 2005, plaintiff reported to the emergency room with complaints of pain.  Specifically, plaintiff complained of "two weeks of bilateral mid thoracic back pain."  Dr. Patricia Tan, M.D., reported the following findings upon her examination of plaintiff:

> Vital signs unremarkable.  The patient appears comfortable in the gurney but does move slowly once up and about with fairly good range  of motion in his spine.  He has a slow gait but normal, no ataxia.  He can walk on tip toes and heels.  He has no vertebral percussion tenderness.  He does have low to mild paraspinous muscle tenderness.  There is no warmth or erythema over his spine.  Again the patient has deep tendon reflexes symmetric and petellar and ankle reflexes.

3.      Radiation Oncology Center Records

These records relate to plaintiff's throat cancer and reveal that, with radiation therapy, plaintiff was doing "extremely well" and his cancer had been eliminated.  The record indicates that plaintiff continues to smoke.

**B.      Medical Records – Mental Impairments**

The certified administrative record ("CAR") contains the following relevant medical records concerning plaintiff's mental impairments:  (1) psychological evaluation dated March 7, 2003, by agency examining doctor David C. Richwerger, Ed.D. (CAR 324-29); (2) mental residual functional capacity assessment dated April 1, 2003, by an agency consultative doctor (CAR 337-40); (3) mental residual functional capacity evaluation, with related psychiatric review technique form, dated April 9, 2003, by an agency consultative doctor (CAR 341-43; 355-68); (4) report dated January 30, 2004, by examining psychologist Michelina Regazzi, Ph.D. (CAR 410-18); (5) mental residual functional capacity assessment and psychiatric review technique form dated September 28, 2004, by agency consultative doctor Charlotte Bible, M.D. (CAR 457-74); and (6) psychological evaluation dated July 5, 2005, by agency examining doctor Janice Nakagawa, Ph.D. (CAR 479-85).

/ / /

/ / /

/ / /

1.   Agency Doctor Assessments

Several agency doctors provided mental residual functional capacity assessments, including:  (1) David Richwerger, Ed.D.; (2) Charlotte Bible, M.D.; and (3) Janice Nakagawa, Ph.D.

Dr. Richwerger examined plaintiff and prepared an evaluation on March 7, 2003. At the time, Dr. Richwerger had no records to review.  As to daily activities, plaintiff reported the following to Dr. Richwerger:

> The claimant lives in a house with his girlfriend.  The claimant states he does not sleep well, and his appetite is somewhat poor.  The claimant states he does not do any household chores, errands, shopping, or driving. He takes care of his own personal needs.  The claimant states he has no outside activities or hobbies.  The claimant states his girlfriend helps him with his financial affairs.  The claimant states he usually gets around via a car.  The claimant is able to move about alone.  The claimant's girlfriend drove him to this evaluation.  The claimant states he gets along okay with family, relatives, friends, and neighbors.  The claimant states that on a daily basis he just lays down most of the day.

Dr. Richwerger reported plaintiff's full-scale IQ as 59.  As to scores on the Wechsler Adult Intelligence Scale, he opined that "claimant scored at the high end of the mildly impaired range" but suggested that the "claimant's scores may have been a slight underestimate of his actual cognitive ability due to the aftereffects of alcohol," although plaintiff denied being intoxicated. Dr. Richwerger diagnosed active alcohol dependence, mild retardation, and assigned a GAF of 50 due to continued alcohol use.  Overall, Dr. Richwerger opined that plaintiff's cognitive abilities are being affected by alcohol use.

In April 2003, two agency consultative doctors prepared mental residual functional capacity assessments.  In the first, dated April 1, 2003, the doctor concluded that plaintiff was markedly limited in the ability to understand, remember, and carry out detailed instructions.  The doctor concluded that plaintiff was mildly impaired as to:  (1) ability to perform activities within a schedule; (2) ability to work in coordination with others; (3) ability to accept instructions and respond to criticism; (4) ability to get along with others; and (5) ability to

respond to changes in work setting.  In all other categories, the doctor concluded that plaintiff was not significantly limited.  In the second assessment, dated April 9, 2003, the doctor concluded:

> I would have no problems going along with the light RFC mentally.  A little tougher considering that the examiner felt the prior use of alcohol influenced his test results – also on app. reported that he wasn't in special ed. but at psych. CE said he was overall, I would say that if he were to stop using his daily alcohol he could do simple work. . . .

. The doctor assessed mild difficulties with social functioning and moderate difficulties with concentration, persistence, and pace.  He did not find any limitations on daily activities.

Agency consultative doctor Charlotte Bible, M.D., completed a mental residual functional capacity assessment on September 28, 2004.  She noted mild limitations in activities of daily living and social functioning and moderate limitations in maintaining concentration, persistence, and pace.  She also noted alcohol dependence.  Dr. Bible concluded:

> The claimant would be able to perform unskilled work activities on a consistent basis, but no semi-skilled or skilled activities.  The claimant would be able to maintain adequate attention, concentration, persistence, and pace in the workplace setting.  The claimant would be able to interact appropriately with the general public, co-workers, and supervisors.

Plaintiff was examined on July 5, 2005, by Janice Nakagawa, Ph.D.  In her report, Dr. Nakagawa noted:

> Claimant started smoking cigarettes at age 19 and still smokes a pack of cigarettes a day.  He began drinking alcohol around age 16 and continues to drink about two or three 40-ounce bottles of beer; the last time was the 4th of July.  He could not remember how much he drank. . . .

As to test results, Dr. Nakagawa stated that plaintiff "was very inconsistent in testing, and data were consistent with an individual attempting to present in the worst possible light, i.e., malinger."  She concluded that his responses "clearly indicated malingering."  Her impressions were as follows:

> Claimant is a 52-year-old, right-hand-dominant, divorced, African American male who reports he was treated for throat cancer a number of years ago and experienced severe back pain even with medication.  He

reports illiteracy, which makes it difficult to find a job.  Results of this assessment indicate he was attempting to malinger.  As a result, it is impossible to provide any accurate assessment of his work capabilities.  He continues to drink alcohol.

2.    Dr. Regazzi

Plaintiff was evaluated by Dr. Regazzi on referral from his attorney.  Dr. Regazzi conducted an examination on January 27, 2004, to determine plaintiff's cognitive functioning.  Her report was prepared on January 30, 2004.  Dr. Regazzi began her report by noting that plaintiff has never taken any psychiatric medications before.  As to alcohol, plaintiff reported that he "drinks a couple of days per week, maybe a six pack each time" and that he had a drinking problem "years ago."  As to daily activities, plaintiff reported:

> Mr. Marshall stated that he gets up at 9:00 a.m.  He stated that he has adequate bathing and grooming habits.  He stated that he takes his medication, gets breakfast, and then sits and watches TV.  He stated that he watches cartoons and sports.  He stated that he does his own cooking and cleaning but that he cannot stand more than ten minutes without having to rest.  He stated that his girlfriend helps him a lot.  He stated that she does all of his paperwork and does his laundry.  He stated that he has a valid driver's license and that he passed the test via oral rather than written administration.  He stated that he has his own vehicle.  He stated that he goes with his girlfriend to do his grocery shopping.  He stated that he just goes by the pictures on the products.  He stated that his girlfriend handles his bill paying whereas before his wife did this.  He stated that he has a checking account and that he just signs the checks.

Dr. Regazzi noted on objective examination that plaintiff's speech was marked by "mild articulation problems and poor grammar."  He had adequate ability to express his thoughts in a logical fashion and was cooperative.  The results of the Wide Range Achievement Test indicated a first-grade equivalence in reading and spelling and a third-grade equivalence in arithmetic.  The Wechsler Adult Intelligence Scale test indicated that plaintiff's functioning is in the borderline range.  His full-scale IQ was reported as 74.  Dr. Regazzi concluded plaintiff has a learning disability and borderline intellectual functioning.  She assigned a GAF of 65.  As to

///

///

11

plaintiff's capabilities and limitations, Dr. Regazzi opined:

> Mr. Marshall is capable of understanding and carrying out simple instructions. He would be capable of performing simple, repetitive tasks. He has a relative strength in visual sequencing and perception of visual detail. He is capable of traveling independently. He is capable of carrying out most activities of daily living but needs assistance with financial and business matters. There appear to be no impairments in his social interaction.
>
> Mr. Marshall has below average intelligence and very poor academic skills, and could therefore not learn at the pace of non-impaired peers. He is unable to read simple instructions. He can be expected to have difficulty carrying out complex tasks. He can be expected to have a slower work pace than his peers.

### III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a particular finding, the finding of the Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).  Therefore, where the evidence is susceptible to more than one rational interpretation, one of which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

In his motion for summary judgment, plaintiff argues:  (1) the ALJ's severity finding failed to take into account plaintiff's cognitive impairments; (2) the ALJ erred in concluding that plaintiff's alcohol use was a materially contributing factor; and (3) the ALJ failed to include all of plaintiff's impairments in hypothetical questions posed to the vocational expert. The focus of these three arguments is on limitations associated with cognitive deficits, which plaintiff contends the ALJ failed to adequately address or credit.  Plaintiff also asserts as part of his third argument that the ALJ erred in determining that his testimony was not credible with respect to physical limitations on walking, sitting, and standing.

### A.    Severity Determination

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[1]  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

---

[1]    Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1   Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

2   1988) (adopting SSR 85-28).  The plaintiff has the burden of establishing the severity of the

3   impairment by providing medical evidence consisting of signs, symptoms, and laboratory

4   findings.  See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

5   is insufficient.  See id.

6            In this case, plaintiff argues that the ALJ failed to take his mental impairments,

7   which he states include cognitive deficits, into account in concluding that his severe impairments

8   consisted only of "severe status post throat cancer residuals and musculoskeletal impairments."

9   Specifically, plaintiff challenges the ALJ's conclusion that plaintiff "does not have a non-

10  alcoholism related severe mental impairment."

11           Diagnosed alcoholism may constitute a severe impairment.  See Cooper v.

12  Bowen, 815 F.2d 557 (9th Cir. 1987).   In Cooper, the claimant had been diagnosed as an

13  alcoholic by two separate medical doctors and a vocational rehabilitation counselor concluded

14  that the claimant's alcoholism was an impairment to occupational functions.  See id. at 559.  The

15  evidence established that, even though the claimant was taking Antabuse – a drug designed to

16  induce nausea when mixed with alcohol – the claimant continued to drink up to a quart of

17  whiskey every day.  See id. The Ninth Circuit observed that uncontrollable diagnosed

18  alcoholism can be a disabling condition if:  (1) the claimant is addicted to alcohol; (2) does not

19  have the ability to control its use voluntarily as a consequence of the addiction; and (3) alcohol

20  use precludes the claimant from obtaining and maintaining employment.  See id. at 560-61

21  (citing Ferguson v. Schweiker, 641 F.2d 243, 249 (5th Cir. 1981).  The court held that

22  physiological damage is not necessary to such a finding.  See id.  The court remanded to allow

23  the ALJ to ". . . make a specific finding on the claimant's ability to control his . . . drinking and

24  its disabling effect."  Id.

25  / / /

26  / / /

After summarizing the medical record regarding plaintiff's physical impairments, the ALJ discussed the record of plaintiff's mental impairments as follows:

> . . . [T]he Administrative Law Judge . . . finds that the evidence of record clearly demonstrates that the claimant's primary mental impairment is alcohol abuse. This findings is well reflected throughout the record where it has been consistently reported that the claimant is a very heavy, chronic abuser of alcohol. In this respect, the record contains a consultative psychological evaluation from Dr. David Richwerger, Ed.D., dated March 2003, which concluded that the claimant's active alcohol dependence precludes him from maintaining concentration, persistence and pace, handling stress, understanding and carrying out detailed or complex tasks, and managing funds (Ex. 5F). Similarly, a non-examining state agency psychiatrist concluded in April 2003 that the claimant's alcohol abuse has resulted in moderate to marked mental limitations and thereby meets the disability criteria of section 12.09 of the Listing of Impairments (Ex 7F). More recently, it was noted in July 2005 that the claimant was consuming two or three 40-ounce bottles of beer at a time (Ex. 16F). This is consistent with both the claimant's prior testimony that he consumes six or seven beers every two days and his current testimony that he consumes eight to nine beers and three to four shots of whiskey daily. Thus, it is determined that the claimant is considered to be an uncontrollable alcoholic who is incapable of maintaining employment and is therefore disabled within the meaning of <u>Cooper v. Bowen</u>, 815 F.2d 557 (9th Cir. 1987).
>
> . . . [T]he undersigned further finds that, because the claimant would not have any of the non-exertional mental impairment related limitations noted above in the absence of his alcohol abuse, it is deemed to be his primary mental impairment. Therefore, because the claimant's substance abuse is a material contributing factor to the findings of his disability, under Public Law 104-121, he cannot be considered eligible for Disability Insurance Benefits. . . .

Thus, even though the ALJ concluded that plaintiff was disabled due to uncontrollable alcoholism, the ALJ nonetheless concluded that plaintiff was not entitled to benefits because his alcohol use was a material factor in the determination of disability.

At the outset, the court notes that the ALJ erred with respect to his conclusion that plaintiff was disabled due to uncontrollable alcoholism. Specifically, unlike the claimant in <u>Cooper</u>, plaintiff has never been diagnosed with alcoholism by a medical doctor. While the record certainly supports the ALJ's finding that plaintiff abused alcohol, a finding of disability based on alcoholism under <u>Cooper</u> is premised on an underlying diagnosis of alcoholism.

1   Because there is no such diagnosis in this case, the court concludes that the ALJ erred in

2   determining that the <u>Cooper</u> criteria had been met.  The ALJ simply is not qualified to reach the

3   medical conclusion that plaintiff is "addicted to alcohol."[2]

4           This error, however, makes no difference because the court agrees with the ALJ

5   that, regardless of whether it is disabling or not, plaintiff's alcohol use is a material factor

6   contributing to the disability determination.  If drug or alcohol use is a contributing factor

7   material to a determination of disability, an individual is not entitled to benefits.  <u>See</u> 20 C.F.R.

8   §§ 404.1535 and 416.945; <u>see also</u> <u>Sousa v. Callahan</u>, 143 F.3d 1240, 1245 (9th Cir. 1998).  The

9   burden is on the plaintiff to demonstrate that drug and alcohol addiction is not a material factor

10  by showing that an impairment would have been disabling even if drug and alcohol use ceased.

11  <u>See</u> <u>Parra v. Astrue</u>, 481 F.3d 742, 748 (9th Cir. 2007).  To do so, the plaintiff would have to

12  demonstrate that the impairment ". . . would remain during periods when she stopped using drugs

13  and alcohol."  <u>See</u> <u>Ball v. Massanari</u>, 254 F.3d 817, 821 (9th Cir. 2001) (citing <u>Sousa</u>, 143 F.3d

14  at 1245).

15          The question is whether plaintiff has demonstrated the existence of a disabling

16  mental impairment which would exist if his alcohol use stopped.  In this regard, the ALJ stated:

17          A further issue is whether the claimant has a mental impairment or
            impairments that would impose limitations in his non-exertional residual
18          functional capacity "but for" his substance abuse disorder.  In this respect,
            the record shows that while several mental health doctors have opined that
19          the claimant has significant non-exertional functional limitations, they
            believed that his chronic, severe alcoholism was his primary impairment.
20          As discussed above, Dr. Richwerger attributed the claimant's marked non-
            exertional limitations to his alcoholism and even linked his mild mental
21          retardation with IQ scores of under 71 to this condition (Ex. 5F).  In fact,
            the doctor stated that the claimant's IQ scores were an under-
22          representation of his intellectual abilities due to the aftereffects of his
            alcoholism, that he may still be suffering from the effects of withdrawing
23          from the use of alcohol, and that his memory loss may be related to his
            significant alcoholism (Ex. 5F).  Likewise, inasmuch as a non-examining
24          state agency psychiatrist in April 2003 noted moderate to marked non-

25  ─────────────────

26          [2]     While Dr. Richwerger diagnosed "active alcohol dependence," he is not a medical
    doctor qualified to make a diagnosis of alcoholism.

1    exertional limitations in the claimant's functioning, this doctor also
      attributed such restrictions to the claimant's alcoholism and related
2    cognitive deficits rather than any other mental disorder(s) (Ex. 7F). . . .

3 As to Dr. Regazzi's conclusions, the ALJ stated:

4     . . .Although a subsequent consultative psychologist, Dr. M. Regazzi,
      Ph.D., concluded in January 2004 the claimant's borderline intellectual
5    functioning and learning disorder moderately to severely impaired his
      ability to comprehend and follow instructions and perform complex job
6    tasks and moderately impaired . . . his ability to perform most other non-
      exertional functional tasks, these limitations cannot be accorded any
7    weight because the claimant deliberately misled the doctor by minimizing
      the nature and extent of his alcoholism (Ex. 9F).  Moreover, this
8    assessment is discredited because it was prepared by a one-time examiner
      who was hired by the claimant's attorney, is at odds with the fact that the
9    claimant has not required mental health treatment, psychiatric medications,
      or psychiatric hospitalization, was based upon the doctor's observation of
10   the claimant rather than on any subjective mental status examination, and
      was not corroborated by any other credible mental health evidence
11   contained in the record.  The doctor's assessment also inconsistently
      concluded that, while the claimant does not have any social functional
12   restrictions, he conversely noted in an attached questionnaire that
      moderate restrictions were present in his ability to socially interact with
13   others.  Even more compelling is the claimant's false statement to the
      doctor that he was only consuming alcohol a couple of times each week
14   and that he "had a drinking problem years ago."  Finally, the record
      contains a recent consultative psychological evaluation from Dr. Janice
15   Nakagawa, Ph.D., dated July 5, 2005, which concluded that because the
      claimant was a "malingerer" who continued to abuse alcohol, it would be
16   impossible to provide an accurate assessment of the claimant's work
      capabilities (Ex. 16F).  Consequently, the undersigned finds that given the
17   scant evidence of a mental impairment "but for" the claimant's substance
      abuse, he does not have more than slight limitations in his non-exertional
18   functioning and any non-alcohol related impairments are therefore deemed
      to be non-severe.

19

20    Plaintiff argues:  "It is clear from the record that Mr. Marshall's disabilities would

21 remain whether he used alcohol or not."  Specifically, plaintiff points to his learning disorder and

22 borderline intellectual functioning, which he asserts pre-date any alcohol use.  However,

23 accepting plaintiff's contention that his cognitive deficits pre-date alcohol use, the question is not

24 whether plaintiff has an impairment in the absence of alcohol use, but whether such impairment

25 is disabling absent alcohol use.  The record clearly demonstrates that, while plaintiff has

26 cognitive impairments which are not necessarily caused by alcohol use, they only become

disabling with alcohol use.  In other words, if plaintiff stopped using alcohol, his cognitive impairments would not be disabling.

For example, Dr. Richwerger noted that "claimant scored at the high end of the mildly impaired range" but that these results were an underestimate of his actual cognitive ability due to alcohol use.  Thus,  according to Dr. Richwerger, plaintiff's actual cognitive ability in the absence of alcohol use is, at worst, only mildly impaired.  This does not suggest a disabling mental impairment in the absence of alcohol use.  Similarly, neither of the agency doctors who provided assessments in April 2003 indicated more than mild limitations.  And, even though Dr. Bible noted some moderate limitations, she nonetheless concluded that plaintiff ". . . would be able to perform unskilled work activities on a consistent basis. . . ."

As to Dr. Regazzi, the court agrees with the ALJ that plaintiff understated his alcohol use.  Even still, Dr. Regazzi noted that plaintiff ". . . had adequate ability to express his thoughts in a logical fashion and was cooperative."  She also concluded that plaintiff s full-scale IQ was 74 – higher than the IQ of 59 Dr. Richwerger noted.  Dr. Regazzi concluded plaintiff has a learning disability and borderline intellectual functioning.  She also noted that plaintiff had particular strength with respect to visual sequencing and detail.  Dr. Regazzi did not note any disabling limitations.   Because her conclusions were reached in the context of plaintiff's understatement of his alcohol use, it follows that the conclusions are valid even in light of plaintiff's actual alcohol use.

Finally,  the state agency doctor who provided a mental residual functional capacity assessment on April 9, 2003, specifically concluded that ". . . if [plaintiff] were to stop using his daily alcohol he could do simple work. . . ."  This conclusion is consistent with the other doctors' findings and supports the ALJ's analysis.

///

///

///

18

In sum, while the court accepts that plaintiff clearly has cognitive limitations, he has not demonstrated that they would be disabling in the absence of alcohol use. To the contrary, the evidence indicates that, if plaintiff stopped using alcohol, his mental deficits would not be disabling at all. Therefore, the court finds that the ALJ's conclusion that alcohol use is a material contributing factor is supported by proper legal analysis and the record as a whole.

**B.     Hypothetical Questions**

Plaintiff argues that the hypothetical question posed to the vocational expert by the ALJ was incomplete because it did not account for limitations associated with plaintiff's mental and physical impairments. As to physical impairments, plaintiff asserts that the ALJ improperly rejected his testimony concerning limitations on walking, sitting, and standing as not credible. It is not necessary for the court to address these arguments because any error would be harmless. The Ninth Circuit has applied harmless error analysis in social security cases in a number of contexts. For example, in Stout v. Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's failure to consider uncontradicted lay witness testimony could only be considered harmless ". . . if no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056. Similarly, in Batson v. Commissioner of Social Security, 359 F.3d 1190 (9th Cir. 2004), the court applied harmless error analysis to the ALJ's failure to properly credit the claimant's testimony. Specifically, the court held:

> However, in light of all the other reasons given by the ALJ for Batson's lack of credibility and his residual functional capacity, and in light of the objective medical evidence on which the ALJ relied there was substantial evidence supporting the ALJ's decision. Any error the ALJ may have committed in assuming that Batson was sitting while watching television, to the extent that this bore on an assessment of ability to work, was in our view harmless and does not negate the validity of the ALJ's ultimate conclusion that Batson's testimony was not credible.

> Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

///

In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the claimant's age and education.

In light of the conclusion reached above, even if the ALJ erred with respect to hypothetical questions posed to the vocational expert because they did not accurately reflect plaintiff's limitations, and even if the ALJ erred with respect to his finding that plaintiff could perform light work, plaintiff is nonetheless barred from receiving benefits due to his alcohol abuse.  Thus, any error with respect to hypothetical questions would be harmless because. given plaintiff's alcohol abuse, no ALJ would reasonably find that plaintiff could receive benefits.

In any event, the record reflects that the ALJ did in fact accurately describe plaintiff's limitations in hypothetical questions posed to the vocational expert.  Specifically, the ALJ's hypothetical included the following parameters:

1.   Plaintiff is 53 years old;

2.   Plaintiff has a limited education (through ninth or tenth grade);

3.   Plaintiff has the residual functional capacity to perform light work;

4.   Plaintiff meets Listing 12.09 for alcohol use;

5.   Plaintiff has mild cognitive disorder and mild mental retardation;

6.   Plaintiff cannot read or understand complex instructions/tasks; and

7.   Plaintiff cannot perform skilled or semi-skilled work.

This accurately describes plaintiff.

As to plaintiff's mental impairments, which are discussed above, the court agrees with the ALJ that he has only mild cognitive deficits and that any greater limitation is due to alcohol abuse.  As to plaintiff's physical limitations, plaintiff contends the ALJ failed to credit his testimony concerning his ability to sit, stand, and walk.  Regarding plaintiff's credibility regarding these limitations, the ALJ stated:

> The claimant previously testified that he is unable to perform prolonged sitting, standing, walking, and lifting more than 20 pounds due to residuals from a prior case of throat cancer and chronic, severe neck and back pain.

He stated that his throat cancer is in remission following radiation treatment, multiple pain medications have been prescribed and treatment has consisted of visiting his physician two or three times in 2002 and six times in 2003. . . . His alleged extreme limitations of walking a block, standing for 15 minutes and sitting for 30 minutes are rejected because these limitations are contrary to other evidence of record. . . .

The Commissioner determines whether a disability applicant is credible, and the court defers to the Commissioner's discretion if the Commissioner used the proper process and provided proper reasons. See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995). An explicit credibility finding must be supported by specific, cogent reasons. See Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). General findings are insufficient. See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony. See id. Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing." See id.

If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc). The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions. See id. at 345-47. In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms. See Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

///

///

21

In this case, there is evidence of malingering.  Specifically, Dr. Nakagawa stated that plaintiff "was very inconsistent in testing, and data were consistent with an individual attempting to present in the worst possible light, i.e., malinger."  Further, the ALJ is correct that the record does not support the extreme physical limitations suggested by plaintiff's testimony.  Drs. Pong, Mihelson, Dipsia, and Clancey all agreed that plaintiff retained the residual functional capacity for light work and that plaintiff was not as limited in standing, walking, and sitting as he states.  These agency doctors' conclusions are supported by records from plaintiff's treating physicians at Kaiser Permanente.  In particular, treatment notes from November 3, 2003, reflect that plaintiff's pain remained about the same and that the treatment plan was unchanged.  On November 10, 2003, plaintiff's pain was "better, improved" and the treatment plan was unchanged.  On December 17, 2003, and March 2, 2004, plaintiff reported that his pain is "much better, improved considerably."  Again, the treatment plain was unchanged.  This clearly demonstrates, as the ALJ found, that plaintiff had marked medical improvement.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

1.      Plaintiff's motion for summary judgment is denied;

2.      Defendant's cross-motion for summary judgment is granted; and

3.      The Clerk of the Court is directed to enter judgment and close this file.

DATED: February 14, 2008

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE